Filed 7/7/16  In re C.T. CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re C.T., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>T.T.,<br><br>    Defendant and Appellant. | A146638<br>(Contra Costa County Super. Ct. No. JI3-00386) |

T.T., the mother of C.T., a child born in January 2013, appeals from the Contra Costa County juvenile court's order terminating her parental rights and setting adoption as a permanent plan for C.T. pursuant to Welfare and Institutions Code section 366.26.[1] Mother argues the court should have excepted her from termination based on her beneficial relationship with C.T. and that it denied her due process of law by barring her counsel from asking certain questions at the relevant hearing.  We conclude mother does not establish error and affirm the court's order.

---

[1] All statutory references are to the Welfare and Institutions Code.

## BACKGROUND

## I.

### *Events Leading Up to the Setting of a Section 366.26 Hearing*

We extensively recounted the events leading up to the juvenile court's setting of a section 366.26 hearing in our previous unpublished opinion, *T.T. v. Superior Court*, No. A144740, issued in August 2015. We will not repeat them here at great length. In May 2013, the Contra Costa County Children and Family Services Bureau (Bureau) filed a petition pursuant to section 300. C.T., then four months old, had been removed from the custody of mother, then 20 years old, and detained because of mother's[2] alleged failure to protect him pursuant to section 300, subdivision (b) for a number of reasons. At the heart of the Bureau's concerns was that mother had exposed C.T. to a physically and emotionally abusive encounter between her and her father (C.T.'s grandfather) in which police had intervened.

The juvenile court found certain stipulated allegations to be true, asserted jurisdiction over C.T. and, in its disposition order, ordered that C.T. be placed in foster care and reunification services be provided to mother. At first, mother refused to participate in services, but made enough progress by June 2014 to regain custody of C.T. She then received family maintenance services.

Mother subsequently violated her case plan by allowing grandfather unsupervised visits with C.T. In September 2014, she engaged in another abusive encounter with grandfather in C.T.'s presence. She did not disclose this encounter to the Bureau, then lied about it and continued to allow grandfather unauthorized, unsupervised visits with C.T.

The Bureau filed a supplemental petition. The juvenile court sustained all of the Bureau's allegations, asserted jurisdiction and ordered that C.T. be placed in foster care. At disposition, the court declined to order further services, terminated mother's family

---

[2] There were also allegations against C.T.'s father. The record indicates he did not play any role in taking care of C.T. and never appeared in the proceedings. Therefore, we do not discuss him further.

reunification services and scheduled a section 366.26 hearing to consider terminating mother's parental rights and set a permanent plan for C.T.

Mother filed a petition for an extraordinary writ with this court. In our previous opinion, we noted that we were not without sympathy for mother's view that she was a capable mother and the long-time subject of grandfather's abuse. Nonetheless, we were required to concern ourselves with C.T.'s best interests. We concluded the juvenile court and the Bureau had repeatedly warned mother that she could lose services, and possibly C.T., if she allowed grandfather unsupervised access to him and engaged in more abusive encounters with grandfather in C.T.'s presence. She did not heed these warnings. Instead, she was deceptive with, and belligerent towards, the court and the Bureau and resisted fully engaging in her case plan. For these reasons, as well as others that are not germane to this appeal, we denied mother's petition for extraordinary writ.

## II.

### *The Bureau's Section 366.26 Report*

#### A. *The Bureau's July 2015 Report*

In its July 2015 report to the juvenile court in preparation for the 366.26 hearing, the Bureau, caseworker Jennifer Lund reporting, indicated C.T., then two and a half years old, had spent 22 of his 30 months of life outside of mother's care. He had been living in what the Bureau characterized as his "prospective adoptive home" in Contra Costa County since October 2014. He was in good physical health, smiled and interacted with others, and did not show fear of strangers. He showed "a clear bond to his prospective adoptive mother," who was a single parent with adult children. He sought her assistance and affection often, even while in mother's presence. He was "very attached" to her and, the Bureau stated, "seeks her out for help, tries to speak to her, climbs into her lap and runs to her to hug her. When social workers visit him at his home, he is happy to interact with others, however, seeks his prospective adoptive parent out for support/affection." C.T. was responding well "to the prospective adoptive parent's clear rules and boundaries, because he knows what to expect, his tantrums are minimal."

3

A doctor who examined C.T. found " 'red flags' present for autism or a related condition" and C.T. was referred for further assessments. Subsequently, he was found to have " 'grossly age appropriate play skills,' " but " 'delayed' " speech. The Bureau believed that his prospective adoptive parent was committed to him and that his current home could best meet his special needs.

The Bureau further reported that mother had filed for a restraining order against grandfather in January 2015 and had obtained one. She regularly attended her visits with C.T., which were changed in May 2015 from weekly to twice monthly. It "[was] clear" she was bonded with C.T., but it was "not clear" that C.T. shared that same bond with her. Lund and other visitation supervisors had witnessed C.T. "allow the mother to give him affection or interact with him; however, he does not appear to seek her out for affection or to engage with him a majority of the time." In March 2015, "there were several visitation notes that stated that 'there is "no" non-verbal communication that happens during the hour visit. If, and when there is, it lasts for minutes, if not seconds.' "

The Bureau also reported that C.T. "had no reaction to the reduction of visitation [in May 2015]. Additionally, he does not have any reaction to leaving a visit with the mother when it is over. The reoccurring theme throughout the visits since October 2014 is [C.T.] throwing significant tantrums during visits and the mother not knowing how to respond to him. She admitted this fact in December 2014. The mother has been repeatedly coached in how to handle the tantrums by the visitation supervisors and foster parent. She has chosen to allow the tantrums to go on and rewards the behaviors by giving in to [C.T.'s] wishes or offering him something he would like." [¶] . . . [C.T.] does recognize her as someone he enjoys seeing, however, he does not recognize her as his parent—to put it quite simply she has not parented him the majority of his life. [C.T.] does not have a significant parent/child relationship that would outweigh the benefits of legal permanency for [C.T.]."

The Bureau also stated "mother has not changed the core factors that have brought her to the attention of the [Bureau]. Although she has visited [C.T.] and loves him dearly, she still denies her involvement and responsibility in the severe domestic violence

4

incidents that resulted in [C.T.'s] two removals from her care. She has admitted that in doing the services that were requested of her she did not feel that any of them were helpful, and in fact, conveyed to a previous social worker that she feels [the Bureau] makes 'bigger deals' out of things than they need to be. [¶] . . . Since the inception of this case, [mother] has continuously blamed her father, the Bureau and her previous social workers for [C.T.'s] removal from her care. Although she did participate in services throughout her case plan and reports that she continues to participate in parenting and other services, it is impossible for her to gain insight into the safety concerns for [C.T.], if she does not first acknowledge her own responsibility in the incidents."

The Bureau concluded that C.T. was adoptable and that this was the preferred plan for him. It recommended the court terminate all parental rights and find adoption in his best interests. His foster mother had successfully completed an adoption homestudy, and the Bureau thought she had the most appropriate potential adoptive home for him.

## B. *The Bureau's September Update*

The Bureau, Lund again reporting, also submitted a September 25, 2015 update to its section 366.26 report, in which it maintained its previous recommendations. It reported that C.T. continued to do "exceedingly well" in his placement. His development delays were assessed and not found to be on the autism spectrum, but there were concerns about his lack of ability to make eye contact. He also "struggl[ed] through most" of his weekly speech therapy sessions and had a hard time "focusing."

Mother continued to have successful visits with C.T. twice a month. C.T. was "happy to visit with his mother, and just as happy to leave with his caregiver." Mother was "always happy to see [C.T.] and clearly expresse[d] her love to him." The Bureau was concerned that C.T. did not view mother as his parent. Also, although the Bureau had encouraged mother to "meet [C.T.] where he [was] developmentally," she "consistently ignored advice and guidance, which . . . caused [C.T.] to have significant tantrums during visits."

The Bureau continued to have concerns about "mother's ability to control her own

5

involvement in potential domestic violence situations." According to police records, in May 2015, a call to police was made by an unidentified female from mother's cell phone, who screamed that her boyfriend was going to kill her. Then, police were called to mother's residence regarding an early July 2015 incident. Her boyfriend told police mother was " 'having mental issues and he doesn't feel comfortable with her there and says he pushed her outside.' " The boyfriend's mother later said "the situation was diffused and . . . mother was taken to the hospital for an anxiety attack." Mother told the Bureau she had had heated arguments with her boyfriend's mother, who had " 'lied on her' " and " 'choked her.' "

### III.

### *The Section 366.26 Hearing*

#### A. The Evidence Presented

The section 366.26 hearing commenced on September 30, 2015. Several witnesses testified. We summarize only that testimony relevant to the resolution of this appeal.

#### 1. *Jeanette Naku*

Jeanette Naku testified that she had supervised several visits between mother and C.T. in both 2013 and 2014. Mother was attentive, loving and affectionate towards C.T. Mother consoled C.T., carried and fed him, held him as he fell asleep, changed his diaper and played with him. Naku saw nothing inappropriate occur between them. She did witness C.T. leave the room when mother was present; she also saw C.T. have a tantrum with mother, and mother redirect him and help him to settle down.

#### 2. *Maritza Buckman*

Maritza Buckman, testified that she also supervised some visits between mother and C.T. In a June 2015 visit, when C.T. threw himself on floor in a tantrum and cried, mother carried him and he settled down. When the foster parent arrived, C.T. smiled and walked over to her, and appeared comfortable with her. At the end of a July 2015 visit, C.T. appeared to not want to go. In August 2015, C.T. hugged mother upon seeing her, mother hugged and kissed him, and C.T. attempted to communicate verbally with her. In

6

another August 2015 visit, C.T. appeared to cling to mother. During a September visit, C.T. ran for the door at the conclusion of the visit, stopping to say goodbye to mother only when he was prompted by the parent aide, and transitioned well back to the foster parent.

Buckman encouraged mother to discuss C.T.'s needs with his foster mother but mother did not. Mother was encouraged to learn sign language in order to better communicate with C.T., but she did not use any during visits. She said C.T. spoke fine for his age and that she understood him even if others could not always do so. Prior to a late July 2015 visit, mother remarked that her first priority was her newborn. She also followed foster mother's advice about how to give C.T. a drink.

### 3. *Melissa Leiva*

Social Worker Melissa Leiva testified that she observed mother and C.T. during visits in July and August 2014, when C.T. was living with mother. In the August visit, Mother was very attentive to and playful with C.T., who was well-dressed, clean, smiled often and laid down near mother. Asked if she witnessed C.T. have any tantrums or meltdowns during the July visit, Leiva said she did not.

### 4. *Mena Adams*

Mena Adams testified that she supervised visits between mother and C.T. from December 17, 2014, until February 5, 2015. During one or another of these visits, mother spent time on her cell phone, appropriately redirected C.T. when he had a tantrum, blamed the Bureau for C.T.'s autism, played with C.T., calmed C.T. when he had tantrums and spoke slowly to him, and had him repeat his words. Adams also observed during one visit that mother spoke slowly to C.T. and in an age appropriate manner, asked C.T. to repeat her, and encouraged C.T. Adams noted that there was usually a smooth transition to the foster mother when she arrived to pick up C.T.

### 5. *Jennifer Lund*

The present caseworker for the case, Jennifer Lund, also testified. Lund said she obtained her masters in social work in 2006, and had coursework in bonding. She has worked as a social worker for the past ten years, including two and a half years handling

private adoptions, and "much" of her job was "to assess children's development, normal behaviors, [and] traumatic behaviors." She was assigned to the adoptions unit for the Bureau about two months before the hearing.

Lund testified that, as part of her assessment of a permanent plan for C.T., she contacted others in May 2015 familiar with visitations between C.T. and mother. Mena Adams told her that mother and C.T.'s interactions were positive. C.T. seemed bonded to mother and happy to see her. However, C.T. threw "really bad tantrums" and mother "wasn't positive what to do about it." A supervisor at the facility that supervised visits from March 9, 2015, through May 8, 2015, said the first couple were difficult for C.T. in that he did not know mother, but that this was typical for a child of his age who had been removed from his mother's care.

According to Lund, C.T.'s foster mother said mother called to inquire about C.T. every two to three weeks, but mother said she called weekly. Mother's visits with C.T. continued to be supervised. Lund believed that "mother has not addressed her mental health issues." Although she was out of her father's home, where the domestic violence occurred initially, "there are continuing incidents that would lead us to believe that there are still highly volatile relationships in her life." Also, Lund believed mother was still not forthcoming about her current living situation based on Lund's review of the police report of the July 2015 incident discussed in the Bureau's update.

Lund testified that she observed one visit between mother and C.T., in May 2015. C.T. had a tantrum and Lund thought mother "did not know how to respond to his behavior. And he definitely did not seek affection in the same manner. He responded to requests for affection willingly, but he did not seek affection of his own accord, the same way that he does with his current caregiver."

Lund also testified about case notes for visits between C.T. and mother in February, July and August 2015. These indicated that in one or the other of these visits C.T. excitedly ran to mother and gave her a big hug and placed his head on her chest, and that mother responded to him affectionately. In August 2015, a staff person from the regional center where C.T. was assessed said he had a short attention span and was

8

difficult to redirect. In March 2014, mother was able to soothe C.T.'s crying.

At some point, Lund said, mother was advised to learn sign language to communicate with C.T., but she did not do so. At her next visit, mother told Maritza Buckman that "her son was fine and she didn't feel that he had a speech delay." Mother signed a form allowing C.T.'s foster mother to take C.T. for treatment and assessments at a regional center and sought to attend assessments. The Bureau denied her request because services had been terminated.

Lund thought C.T. had a bond with mother "similar to an aunt or an uncle or someone that he would see on an ongoing basis," but he "[did] not have a parent/child bond with her. He doesn't see her as a parent." She based her conclusion on her observations of C.T. with his mother and foster mothers, her communications with mother without C.T. and her discussions with other social workers. She also analyzed the relationship between mother and C.T. based on case notes provided by many visitation supervisors.

On the other hand, Lund thought C.T. was "significantly bonded" with his current foster parent. Lund observed C.T. in his foster home monthly, including away from his foster mother. She had seen him run to his foster mother, jump in her lap and give her affection, and seek her approval when he had some stranger anxiety in her presence. He went to her when he needed something, communicated with her so as to meet his needs, and responded to her when there was a need for comfort regarding his tantrums or behavior. Also, the foster mother had both created ways to communicate with C.T. non-verbally and used sign language techniques that were being taught to C.T. She recognized the need for C.T. to be assessed and followed through on what was asked of her, such as regarding C.T.'s participation in speech therapy, play therapy and Head Start. Lund believed it would be detrimental to C.T. to remove him from her care.

### B. Mother's Exception to Termination Argument

After the presentation of the evidence, mother's counsel argued that the court should not terminate mother's parental rights, but instead should order a legal guardianship or some other arrangement because of the beneficial relationship between

9

mother and C.T., an exception to termination provided for in section 366.26, subdivision (c)(1)(B)(i).  She emphasized the testimony of those who had observed a bond between them during visits, and discounted Lund's conclusion that the bond was not of a parent-child nature on the ground that Lund had only witnessed one visit.

The Bureau's counsel responded that C.T. did not have a bond with mother, as the evidence indicated he suffered no detrimental effect from leaving mother, was happy to go to foster mother and looked to her, and had been out of his mother's care for over a year.  Also, mother had not moved past supervised visits imposed for C.T.'s protection. Minor's counsel concurred with the Bureau's counsel.

## C.  The Juvenile Court's Section 366.26 Ruling

The juvenile court adopted the Bureau's recommendations.  It noted that C.T. had spent only 8 months in mother's care and 2 years in the care of a foster parent.  Thus, he had not spent a "very significant portion of his life" in mother's care.  The evidence did not indicate a negative interaction between mother and C.T.; "at worst, it was neutral." Mother "was able at times to soothe [C.T.] in the way that she had developed" and "attempted to play . . . and interact with [C.T.] in appropriate ways."  However, the court also concluded, C.T. had "very special and specific needs."  "[M]other has failed to show that she's able to meet those special needs, given her inability to redirect and help [C.T.] through the tantruming behavior" and "her minimizing of the child's language development and language skills."  Therefore, she had not shown by a preponderance of the evidence that the parent-child beneficial relationship exception applied to her case.

The court also found no basis for ordering a legal guardianship or long-term foster care for C.T.  It found he was an adoptable child in great need, and appeared "very bonded with an adoptive parent."  It found that through adoption, C.T. could find "a permanent, forever, stable and loving home where he will thrive," and that "[t]his bouncing in and out of mother's care will wreck havoc on [him] going forward."

Accordingly, the court found by clear and convincing evidence that C.T. was likely to be adopted, terminated all parental rights, and incorporated recommended findings from the Bureau's report into its order.

Mother filed a timely notice of appeal.

## DISCUSSION

## I.

### *Substantial Evidence Supports the Juvenile Court's Rejection of Mother's Parent-Child Beneficial Relationship Claim.*

Mother first argues that the juvenile court erred in terminating her parental rights because it should have applied the parent-child beneficial relationship exception based on the evidence. We disagree.

### A. The Parent-Child Beneficial Relationship Exception

The law regarding the court's duty in these circumstances is clear. "The avowed goal of dependency law is to protect children who are physically, sexually or emotionally abused, neglected or exploited. [Citation.] Although the protection must focus on the preservation of the family whenever possible, the child who cannot be returned to his or her parent must be provided a stable, permanent home. [Citation.] That child must be placed for adoption, in guardianship, or in long-term foster care. [Citation.]

"Adoption, where possible, is the permanent plan preferred by the Legislature. [Citations.] 'Only if adoption is not possible, or if there are countervailing circumstances, or if it is not in the child's best interests are other, less permanent plans, such as guardianship or long-term foster care considered.' [Citation.] Adoption, of course, requires terminating the natural parents' legal rights to the child; guardianship and long-term foster care leave parental rights intact." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573–574 (*Autumn H.*).) Thus, once a parent has failed to reunify with a child and the court finds that the child is likely to be adopted, the court "shall terminate parental rights" unless the parent shows an exception should be made under the circumstances. (§ 366.26, subd. (c)(1); *Autumn H.*, at p. 574.)

One such exception—asserted by mother below—is if the court "finds a

11

compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) If the court finds that a parent has shown this parent-child beneficial relationship exception applies by a preponderance of the evidence, the " 'preference for adoption is overcome and the natural parent's rights are not terminated.' " (See *In re J.C.* (2014) 226 Cal.App.4th 503, 528–529.)

The parent-child beneficial relationship exception applies when the subject relationship " 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference of adoption is overcome and the natural parent's rights are not terminated.' " (*In re Derek* (1999) 73 Cal.App.4th 823, 827.)

"The balancing of competing considerations must be performed on a case-by-case basis and take into account many variables, including the age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs. [Citation.] When the benefits from a stable and permanent home provided by adoption outweigh the benefits from a continued parent/child relationship, the court should order adoption." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 811.)

"Courts have required more than just 'frequent and loving contact' to establish the requisite benefit for this exception. [Citation.] 'Interaction between natural parent and child will always confer some incidental benefit to the child.' " (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534, quoting *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) "[T]he parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly*

12

harmed. [Citation.] A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

## B. Our Standard of Review

In reviewing for sufficient evidence a court's ruling not to apply the parent-child beneficial relationship exception, "we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) In other words, we must affirm if the ruling is supported by substantial evidence. (See *In re Zachary G.*, *supra*, 77 Cal.App.4th at p. 809.) Further, "[i]t is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53.)

## C. Analysis

Mother does not contest the juvenile court's determination that C.T. was likely to be adopted. Accordingly, we focus on the court's determination that she did not establish by a preponderance of the evidence that the parent-child beneficial relationship exception applied to her case. Substantial evidence supports the juvenile court's determination.

There was substantial evidence that whatever relationship mother had with C.T., it did not outweigh the benefits of adoption in his case. The evidence indicated mother had an overall positive relationship with C.T., but not a parental one, and that mother continued to engage in potentially harmful behaviors that led to the Bureau's original and supplemental petitions. As Lund characterized it, based on not only her own observations, but also those of other workers she spoke to who were familiar with the relationship and her own examination of case notes, C.T.'s relationship with mother was

"similar to an aunt . . . or someone that he would see on an ongoing basis," but "[h]e . . . [did not] see her as a parent."

Substantial evidence also indicated that C.T. was a very young child, 30 months at the time of the hearing, who had spent less than a third of his life in his mother's care and was not so close to her that he would be particularly harmed by the loss of his relationship with her. Lund and the Bureau's report indicated that he had come to see his foster mother, not mother, as his more significant care provider. Lund's, Adam's and Buckman's testimony, as well as the Bureau's report, indicated that C.T., while happy to see mother, often made a smooth transition back to his foster mother at the end of a visit. Also, Lund's testimony and the Bureau's report indicated that C.T. repeatedly had tantrums with mother and that she was often ineffective in dealing with them, despite coaching.

Finally, as the juvenile court found, C.T. was a child with special needs that were best dealt with if he were adopted. His assessment indicated, for example, that he was delayed in his speech. Yet, Buckman testified that mother insisted C.T.'s speech was fine and she was unwilling to use the sign language needed to better communicate him. Substantial evidence further indicated this was to C.T.'s detriment, as it was reported that the foster mother had success with C.T. as result of her commitment to grapple with his special needs.

Mother does not directly challenge much of this evidence. Instead, and despite her claims to the contrary, she in effect asks that we reweigh the evidence in her favor and ignore that which supports the court's ruling. For example, she contends that the evidence shows that C.T. "had the capacity . . . to form a parent/child relationship"; C.T. "had a significant attachment to his mother as she provided excellent attention to his need for physical care, nourishment, comfort, affection and stimulation"; mother "provide[d] the needs for C.T. on a secure emtional level" and C.T. acted in "reciprocal" ways; and "there was a measure of benefit here for C.T. to maintain the relationship with his mother." These contentions are based only on the evidence that favors her view, however, and so are not persuasive under our substantial evidence standard of review.

14

Mother further contends that "there was no evidence that [C.T.] did NOT look to his own mother as if it was NOT a parent/child relationship, or that the child did not view his mother as his mother, bonded to her for affection, nurturing and basic needs." As our review of the evidence indicates, this is not the case.

Mother also contends it is significant that the Bureau did not indicate in its report that C.T. would not suffer detriment. This too is unpersuasive because the Bureau was not required to do so. (See *In re Angel B.*, *supra*, 97 Cal.App.4th at p. 466 [the social service agency "is *not* required to produce evidence demonstrating that a minor would *not* benefit from continued parental contact"].)

Next, mother argues that "[t]he [Bureau's] report and evidence is void of any consideration or fact that the adoption is in the best interest of the child and outweighs the detriment or benefit the child would suffer if parental rights were terminated." This is simply not the case. The Bureau's report reviewed mother's relationhip with C.T. and concluded that "[C.T.] does not have a significant parent/child relationship that would outweigh the benefits of legal permanency for [C.T.]." As we have discussed, Lund's and others' testimony was consistent with this conclusion.

Mother also argues that we should not take into account Lund's conclusion about mother's relationship with C.T. because Lund had only observed one visit and purportedly had "no" experience in bond recognition. Mother ignores Lund's testimony that she also relied for her analysis on her discussions with other social workers and her review of case notes. Lund was also far more experienced than mother contends. While Lund had recently starting working on adoption cases at the Bureau, her undisputed testimony indicated that she was an experienced social worker with extensive experience working with children and had studied bonding in the course of obtaining her advanced social work degree.

Mother cites two cases in support of her contentions, *In re Casey D.*, *supra*, 70 Cal.App.4th 38 and *In re Brandon C.*, *supra*, 71 Cal.App.4th 1530. It is unclear why, however; both cases affirmed a juvenile court's rejection of the parent-child beneficial relationship exception. (*In re Casey D.*, at pp. 49–53; *In re Brandon C.*, at pp. 1533–

15

1538.)  They do nothing for mother's cause.

Finally, mother contends that, even if the evidence shows only that she had the equivalent of an "aunt-like" bond with C.T., this is sufficient to prevent termination of parental rights for the same reason that the Legislature has enacted certain relative placement and relative inquiry provisions for section 300 cases.  (See §§ 309 [regarding temporary relative custody of a child delivered to a social service agency], 361.3 [giving preferential consideration to a relative's request for placement of a child removed from physical custody of parents].)  These provisions recognize the value of familial relationships, but they do not govern after termination of parental rights.[3]

## II.

### *Mother Does Not Establish That Her Due Process Rights Were Violated.*

Mother also argues that she was denied her right to due process of law under the Fifth and Fourteenth Amendments of the United States Constitution because the court did not allow her counsel to ask certain questions during the section 366.26 hearing.  Mother's arguments are unpersuasive.

First, mother contends that the juvenile court should have allowed her to cross-examine Melissa Leiva about a telephone conversation she had with mother in November 2014.  The court refused to allow counsel to question Leiva about the Bureau's report that mother had not taken responsibility for the second removal incident because the court did not see its relevance to the section 366.26 hearing and was quite familiar with the circumstances of that removal, having heard testimony at the relevant detention hearing.  The court stated that it was considering whether to terminate parental rights or apply one of the exceptions, and did not think "whether mother accepts responsibility or not is related to the exceptions."

Second, mother contends that the juvenile court should have allowed her to ask Lund about notes describing mother's visits with C.T. in the first part of 2014.  When

---

[3]  There is an exception to termination of parental rights regarding children living with relatives in certain circumstances (§ 366.26, subd. (c)(1)(A)), but that section is inapplicable and has not been invoked in this case.

16

mother's counsel sought to do so, the court interrupted her after one question and said it would not allow much leeway for questions about a visit 18 months ago, when C.T. was only about 13 months old. The court did not consider such visits "very relevant" to the nature of the present mother-child relationship. Also, there had been "extensive testimony about more current visits which is more reflective of the existing relationship." The court told counsel to "move on."

Counsel stated her purpose was to explore "the issue of bonding" and asked Lund about a February 2014 visit in order to do so. The court told counsel to move on again. It denied counsel's request to submit an offer of proof as to the remainder of the case notes she wanted to ask about, telling counsel she could not ask any more questions about visits that occurred 18 or 19 months ago because "I find them not relevant to the analysis to be applied here today." For the same reason, the court twice prohibited counsel from asking questions about C.T.'s behavior from January to April 2014 during the hearing.

Aside from the most general of legal citations, such as about the juvenile court's duty to not restrict or prevent testimony "on formalistic grounds" (*Guadalupe A. v. Superior Court* (1991) 234 Cal.App.3d 100, 106), mother does not cite any legal authority for her constitutional argument. We are entitled to disregard it for this reason alone. (See, e.g., *People v. Stanley* (1995) 10 Cal.4th 764, 793 [" '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration' "].)

In any event, mother's constitutional argument is not persuasive. Mother does not establish the relevancy of the Bureau's report about her failure to take responsibility to her parent-child beneficial relationship exception claim, and the court did not rely on this aspect of the Bureau's report in deciding that the exception did not apply. Regarding visitations in early 2014, the court held the section 366.26 hearing in September and October 2015 and heard testimony from Naku and Lund about visitations in 2013 and/or 2014, as well as testimony about more recent visits. In this context, it ruled that mother's continued questioning about visitations so far back in time for a child who was not even

17

three years old would not yield relevant evidence.  We see no reason why the court erred in making this determination.  Similarly, in *In re C.F.* (2011) 193 Cal.App.4th 549, the juvenile court at a section 366.26 hearing heard a social worker's testimony that mother played a parental role before the Agency initially took the children into protective custody three years before.  The appellate court rejected mother's contention that this evidence mattered because "[t]he relevant question" was the quality of the parent-child relationship at the time of the section 366.26 hearing.  (*In re C.F.*, at p. 557.)

Furthermore, even assuming that the court erred in barring mother's counsel from making the inquiries that mother highlights, mother does not establish that she was prejudiced by the court's doing so.  (See *In re F.S.* (2016) 243 Cal.App.4th 799, 809–811 [noting that generally, "[a] parent has a right to due process in dependency proceedings," but finding any error was harmless].)  In *In re G.B.* (2014) 227 Cal.App.4th 1147, a mother argued that the court abused its discretion in finding that mother failed to make a prima facie case that an order terminating her reunification services should be modified because she " 'had no opportunity to present evidence, to defend and expand upon the merits of her section 388 petition, or to cross-examine witnesses.' " (*Id.* at p. 1162.)  The court found any error was harmless because she did not identify any additional evidence that she could have presented.  (*Ibid*.)  The same is true here.  There was ample evidence presented to support the court's conclusion that the exception did not apply.  We can think of nothing mother could have presented to change this conclusion and she has not identified anything.

## DISPOSITION

The order appealed from is affirmed.

18

                                                    _____
                                                    STEWART, J.


We concur.


_____
KLINE, P.J.


_____
RICHMAN, J.


*In re C.T.* (A146638)